**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AXEL JOHNSON, INCORPORATED,
Plaintiff-Appellant,

v.

CARROLL CAROLINA OIL COMPANY,
INCORPORATED; LINDA A. CARROLL,
Defendants-Appellees,

No. 99-1041

and

CHARLES S. LANIER, Trustee; PACE
OIL COMPANY, INCORPORATED,
Defendants.

UNITED STATES OF AMERICA,
Amicus Curiae.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
W. Earl Britt, Senior District Judge.
(CA-96-130-7-BR)

Argued: June 8, 1999

Decided: September 14, 1999

Before MURNAGHAN, LUTTIG, and MOTZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Murnaghan and Judge Luttig joined.

_____

**COUNSEL**

**ARGUED:** Kenneth Berlin, Sr., SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellant. Matthew Patrick McGuire, HUNTON & WILLIAMS, Raleigh, North Carolina, for Appellees. Ronald Mark Spritzer, Appellate Section, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Don J. Frost, Jr., SKADDEN, ARPS, SLATE, MEAGHER & FLOM, L.L.P., Washington, D.C., for Appellant. Craig A. Bromby, HUNTON & WILLIAMS, Raleigh, North Carolina, for Appellees. Lois J. Schiffer, Assistant Attorney General, Robert L. Klarquist, Lori Jonas, R. Justin Smith, Appellate Section, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Joseph Freedman, Office of the General Counsel, UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal concerns the cleanup of lead and other hazardous substances at the Old ATC Refinery Site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.A. §§ 9601-9675 (West 1995). Axel Johnson, Incorporated, a former owner and operator of the Refinery property, incurred and expects to incur substantial expenses in connection with the cleanup. Seeking relief from these expenses, Axel brought this cost recovery and contribution action against Carroll Carolina Oil Company, Incorporated (CCO), the current owner of the property, and Linda A. Carroll, who sold the property to CCO. We affirm the district court's grant of summary judgment to Carroll and CCO on Axel's cost recovery claims because we agree with the district court that Axel, as a potentially responsible person under CERCLA, cannot assert such claims. We do not address the district court's rulings on the contribution claims because they have been rendered moot by the

2

entry of a consent decree resolving the liability of Carroll and CCO to the United States.

I.

Axel or its predecessors in interest operated the Refinery property, which is located in Wilmington, North Carolina on the banks of the Cape Fear River, from 1972 through 1984. During most of this twelve-year period, Axel leased the property from Pace Oil Co. under a contract providing that Axel bore responsibility for maintenance of the property, including disposal of any hazardous waste generated there. (Although it is occasionally awkward, we use"property" rather than "site" as shorthand for the Old ATC Refinery Site because "site" appears in CERCLA's definition of "facility," an important term in this case.)

Axel operated the property as a petroleum refinery from 1972 to 1981, and as a petroleum bulk storage facility from 1981 to 1984. The property covers thirteen acres and contains approximately fifteen storage tanks, an extensive network of pipelines connecting the tanks, and several other structures used in Axel's operations. During the first three years that it operated the property, from 1972 to 1975, Axel produced leaded gasoline there by blending tetraethyl lead with gasoline. Lead is a hazardous substance subject to cleanup under CERCLA. Id. § 9601(14)(D); 33 U.S.C.A. § 1317(a)(1) (West 1986); 40 C.F.R. § 401.15 (1999) (lead and compounds); 42 U.S.C.A. § 9602(a); 40 C.F.R. § 302.4 (1999) (tetraethyl lead and other substances identified as lead).

Axel buried wastes from its operations at various locations throughout the property, including at least three places where the EPA subsequently found elevated levels of lead in the soil. The EPA has also discovered that some of the piping that runs throughout the property is lead-contaminated. There is no evidence in the record of any subsequent party using or processing lead at the property.

When Axel ceased operations and left the property in 1984, it emptied some of the aboveground storage tanks that it had used in both its refinery and storage operations at the property. Any material remaining in the other tanks was either sold to the new operator of the

3

property or subsequently transferred to another Axel-controlled facility. Axel strongly relies on the testimony of a former employee stating that Axel "stripped" some of the tanks prior to its departure, but that same employee swore in a declaration and testified when deposed that Axel did not clean any of the tanks before it left the property, explaining that "[s]tripping a tank is removing all useable product" while "[c]leaning a tank is once all of the liquid has been removed or all that can be removed from it, then a crew goes in and physically water washes the tank, scrubs it, scrapes it" (emphasis added). This employee also testified that Axel did not clean the pipelines before severing its ties with the property.

After Axel ceased operations in 1984, Republic Refining Company operated the property as a refinery and storage facility for thirteen months, from January 1985 to February 1986. Pace sold the property in February 1986 to Tracmark Inc. in return for a $6.5 million note, secured by a deed of trust on the property. City Gas & Transmission purchased the property from Tracmark in July 1987 by assuming the note. City Gas did not resume refinery or bulk storage operations, although it did perform other operations at the property until 1991. City Gas ultimately defaulted on the note; neither it nor Tracmark ever made any payments on the note to Pace. In the summer of 1994, Carroll acquired the note from Pace. Carroll foreclosed on the property in April 1996 and purchased it herself at the foreclosure sale. On April 24, 1996, Carroll sold the property to CCO, a company that she created and operated. Neither Carroll nor CCO have performed any operations at the property.

Beginning in 1991, the United States Coast Guard discovered spills and deposits of petroleum products, sludge, and other materials at the property. By 1995 the EPA had determined that the tanks, pipelines, and soils at various locations on the property were contaminated with hazardous substances, and had begun taking emergency action to remove such substances. In July 1996, Axel entered into an "administrative order by consent with EPA," refusing to acknowledge liability but agreeing to pay for and perform certain removal work at the property. In March 1997, the EPA found Axel's cleanup efforts deficient and accordingly took over the cleanup work.

Axel filed this action against Carroll, CCO, and the property trustee in August 1996. Axel claims that it has spent $1 million and will

4

spend an additional $1-2 million in cleaning up the property; it maintains that it is entitled to recover its cleanup costs from Carroll and CCO pursuant to CERCLA § 107, 42 U.S.C.A.§ 9607(a)(1), and that it has a right to contribution from Carroll and CCO pursuant to CERCLA § 113, id. § 9613.

The parties filed cross motions for summary judgment. The district court granted summary judgment to CCO on Axel's cost recovery claim under § 107 based on a determination that Axel is a potentially responsible person and the rule that potentially responsible persons cannot bring § 107 actions. The court granted summary judgment to CCO on Axel's contribution claim under § 113 because it found that CCO had adequately established the "third-party" defense provided by CERCLA § 107(b)(3), id. § 9607(b)(3). Finally, the court granted summary judgment to Carroll on both the § 107 claim and the § 113 claim on the theory that Carroll fell within CERCLA's "lender liability exemption." See id. § 9601(20)(E)(i). Axel appeals.

II.

Section 107(a) of CERCLA permits the United States and private parties to recover the costs of cleaning up hazardous wastes from certain defined types of person. See 42 U.S.C.A. § 9607(a) (West 1995). Those who fall within one of the categories described by the statute are known as "potentially responsible persons," and are strictly liable for cleanup costs subject only to the statute's limited defenses. See Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R., 142 F.3d 769, 774 (4th Cir.), cert. denied, 119 S. Ct. 407 (1998); Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Comm'n, 66 F.3d 669, 677 (4th Cir. 1995); Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 841 (4th Cir. 1992); United States v. Monsanto Co., 858 F.2d 160, 167 (4th Cir. 1988). Potentially responsible persons are usually subject to joint and several liability, Pneumo Abex, 142 F.3d at 776, although in some circumstances they can seek division of damages, Monsanto, 858 F.2d at 171-72, or contribution according to principles of equitable allocation, 42 U.S.C.A. § 9613(f); Nurad, 966 F.2d at 841.

Current owners and operators of a contaminated facility generally qualify as potentially responsible persons under§ 107. See 42

5

U.S.C.A. § 9607(a)(1). Axel argues that both Carroll and CCO fall within this category and that it therefore can assert a cost recovery action against them. The district court rejected Axel's claim because it concluded that Axel was a potentially responsible person, and that Axel therefore fell within the rule prohibiting potentially responsible persons from bringing § 107 actions and restricting them instead to actions for contribution under § 113. See, e.g., Pneumo Abex, 142 F.3d at 776 (noting that apportionment of damages on remand must be made in accordance with § 113 rather than § 107 because potentially responsible persons "must seek contribution under" § 113).

Not satisfied with the contribution remedy, Axel attempts to establish its entitlement to bring a § 107 cost recovery action in two ways. First, Axel suggests that it should not be considered liable under § 107 because most of the substances requiring cleanup were not, it maintains, deposited at the property during the period when it conducted operations there. Second, Axel argues that there is an exception to the rule that potentially responsible persons cannot bring § 107 actions for "innocent" parties, and that it is covered by that exception. We consider each argument in turn.

A.

Axel's suggestion that it should not be considered a potentially responsible person relies upon its contention that "[a]s a former owner/operator of the Site, Axel can only be held liable under CERCLA if at the time of its Site ownership or operation the hazardous substances subject to the CERCLA cleanup . . . were `disposed' of at the `facility' from which they are subsequently released or threatened to be released." Brief of Appellant at 14. Axel cites no authority supporting this proposition, and there is none. Indeed, this argument is inconsistent with the plain meaning of the statute.

In addition to making current owners or operators liable for cleanup costs, § 107 subjects former owners or operators, such as Axel, to liability in certain circumstances. 42 U.S.C.A. § 9607(a). The statute specifically provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, . . . from which there is a release, or a threatened release which causes the incurrence

6

of response costs, of a hazardous substance, shall be liable for . . . all costs of removal or remedial action incurred" by the government and "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Id. (emphasis added).

Thus a party is potentially responsible for cleanup costs if (1) it owned or operated a facility at a time when "any" hazardous substances were disposed of at the facility, and (2) there is "a" release or threatened release of hazardous substances from the facility and that release or threatened release results in the incurrence of response costs. Id. There is no statutory requirement that in order for an owner or operator to be held liable for cleanup costs, the hazardous substances that cause the incurrence of those costs must be the same hazardous substances that were deposited at the facility when the party owned or operated it. Rather, under § 107 a former owner or operator can be held liable for response costs caused by hazardous substances that were deposited at the facility at times when it did not own or operate the facility, so long as some hazardous substances were deposited at the facility during the period when the party did own or operate it and the other requirements of the statute are met. See United States v. Alcan Aluminum Corp., 964 F.2d 252, 264 (3d Cir. 1992) (statute does not on its face require § 107 plaintiff "to prove that the generator's hazardous substances themselves caused the release or caused the incurrence of response costs; rather, it requires the plaintiff to prove that the release or threatened release caused the incurrence of response costs, and that the defendant is a generator of hazardous substances at the facility"); see also, e.g., United States v. Alcan Aluminum Corp., 990 F.2d 711, 721 (2d Cir. 1993) (CERCLA plaintiff is "not required . . . [to] show that a specific defendant's waste caused incurrence of clean-up costs" in order to impose liability on defendant under § 107); Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 670 n.8 (5th Cir. 1989) ("in cases involving multiple sources of contamination, a plaintiff need not prove a specific causal link between costs incurred and an individual generator's waste" to establish § 107 liability).

The definition of "facility," which, as we shall see, is critical to Axel's principal argument, does nothing to alter this understanding of § 107(a). In pertinent part, CERCLA defines facility to include "any site or area where a hazardous substance has been deposited." 42

7

U.S.C.A. § 9601(9). Plugging that definition into § 107(a), CERCLA provides in effect that any person who owned or operated a "site or area where a hazardous substance has been deposited" at a time when "any hazardous substances . . . were disposed of" at that "site or area" is liable for response costs incurred due to the release or threatened release of "a hazardous substance" from the "site or area." Id. §§ 9607(a), 9601(9). Again, CERCLA does not make a party liable for response costs only when the hazardous substances giving rise to those costs are the same as those that were deposited at the facility when the party owned or operated it.

Axel's suggested interpretation of the statute conflicts not only with its plain meaning but also with the firmly-established view of § 107(a) as a strict liability statute. See, e.g., Nurad, 966 F.2d at 841; Monsanto, 858 F.2d at 167. Axel implies that this view of the statute will yield inequitable results. Any inequity arising from the statute's strict liability scheme is, however, mitigated by the availability of contribution actions and division of damages. See United States v. Township of Brighton, 153 F.3d 307, 313 (6th Cir. 1998); Monsanto, 858 F.2d at 171-72.

Thus, we reject Axel's contention that it can only be held liable for cleanup costs incurred due to substances deposited at the property during its tenure. Axel is a person potentially responsible for cleanup costs under § 107.

B.

Axel principally argues that even if it is a potentially responsible person, it should be allowed to bring a § 107 action because it is an "innocent" party with respect to a portion of the site. We find this argument to be unpersuasive too.

Every circuit that has addressed the question, including this one, has held that parties such as Axel who are potentially responsible for cleanup costs under § 107 cannot bring § 107 cost recovery actions; rather, such parties "must seek contribution" under § 113. Pneumo Abex, 142 F.3d at 776; see Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp., 153 F.3d 344, 356 (6th Cir. 1998); Sun Co. v. Browning-Ferris, Inc., 124 F.3d 1187, 1190-91 (10th Cir. 1997), cert.

8

denied, 118 S. Ct. 1045 (1998); Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1301 (9th Cir. 1997), cert. denied, 118 S. Ct. 2340 (1998); New Castle County v. Halliburton NUS Corp., 111 F.3d 1116, 1120 (3d Cir. 1997); Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489, 1496 (11th Cir. 1996); United Techs. Corp. v. Browning-Ferris Indus., Inc., 33 F.3d 96, 101-03 (1st Cir. 1994).

The central difference between a cost recovery action under § 107 and a contribution action under § 113 is that in a § 107 action, a party can impose joint and several liability for all its cleanup costs upon the defendant. A potentially responsible person within the meaning of § 107 is, however, presumptively liable for some portion of those costs, and therefore the only recovery it could properly seek would be partial recovery. A claim for partial recovery of CERCLA costs will generally be indistinguishable from claim for contribution, and thus courts have held that as a general rule any claim for damages made by a potentially responsible person -- even a claim ostensibly made under § 107 -- is considered a contribution claim under § 113. See Pneumo Abex, 142 F.3d at 776; Pinal Creek , 118 F.3d at 1301; New Castle, 111 F.3d at 1122; Redwing Carriers , 94 F.3d at 1496. Axel does not suggest that we should reject this well-established rule, and circuit precedent does not permit us to do so.

Axel does attempt to escape the force of this rule, however, by arguing that it qualifies as an "innocent party" with respect to some of the contamination at the property and that it therefore can maintain a cost recovery action despite its status as a potentially responsible person. Only a few circuits have recognized an "innocent party" exception of this kind, and all but one of those have done so in dicta, rejecting the applicability of any exception on the facts before them. See New Castle, 111 F.3d at 1124 (finding exception inapplicable); Redwing, 94 F.3d at 1496 (same); Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994) (same); see also M & M Realty Co. v. Eberton Terminal Corp., 977 F. Supp. 683, 687 (M.D. Pa. 1997) (same); but see Rumpke of Indiana, Inc. v. Cummins Engine Co., 107 F.3d 1235, 1238 (7th Cir. 1997).

Whether Congress intended or contemplated this kind of treatment for "innocent" but "potentially responsible" parties is not at all clear.

9

Congress enacted CERCLA "to protect public health and the environment from inactive hazardous waste sites." Westfarm, 66 F.3d at 677; see H.R. Rep. No. 96-1061, pt. 1, at 1, 17 (1980), reprinted in 1980 U.S.C.C.A.N. 6119, 6119. Because CERCLA is "a comprehensive remedial statutory scheme, . . . courts must construe its provisions liberally to avoid frustrating the legislature's purpose." Westfarm, 66 F.3d at 677. The rule that potentially responsible persons cannot sue under § 107 protects the strict liability scheme created by the statute, and thus any exceptions to that rule should be narrow ones. If an "innocent party" exception is even possible, a question we need not decide here, it would therefore seem prudent to limit its applicability to those who can make out one of the defenses to liability that § 107 itself provides. See 42 U.S.C.A. § 9607(b)(3). We note that some of the courts that recognize the possibility of an"innocent party" exception have defined it in precisely this way. See New Castle County, 111 F.3d at 1124 ("a potentially responsible person under section 107(a), who is not entitled to any of the defenses enumerated under section 107(b), may not bring a section 107 action against another potentially responsible person"); M & M Realty, 977 F. Supp. at 686 (same). Axel has not even attempted to allege or prove its entitlement to any statutory defense. Thus, Axel could not claim to be an innocent party under the approach followed by the New Castle  and M & M Realty courts.

Axel nevertheless contends that because it is assertedly innocent with respect to some of the contamination -- in particular, the contamination in and around the storage tanks -- it should be allowed to bring a § 107 action for the cleanup costs resulting from that contamination. The few cases that have recognized the possibility of an "innocent party" exception, however, have uniformly made the exception applicable only when the plaintiff is truly innocent of any pollution. See, e.g., Rumpke, 107 F.3d at 1238. In fact, in the one case where a court found that a claimant merited the "innocent party" exception, the claimant had alleged that it "did not pollute the site in any way." Rumpke, 107 F.3d at 1241. Axel cannot be regarded as similarly innocent.

Rather, the record evidence indisputably indicates that Axel bears responsibility for at least some of the hazardous materials spilled at the property. Indeed, as the district court held, the uncontroverted

record evidence shows that the major contaminant at the property is lead and that the only owner or operator of the property to use lead in its operations was Axel. We note that the most Axel does to refute the damning evidence as to lead usage is to argue that later owners of the property stored "pipeline interface" at the property during 1985-86, which "would have contained lead" at that time. Brief of Appellant at 5-6. The parties engaged in extensive discovery and submitted deposition excerpts, affidavits, declarations, expert reports, interrogatory responses, and countless documents in support of their respective summary judgment motions (the joint appendix exceeds 1500 pages), yet Axel apparently produced absolutely nothing to support its claim that later owners or operators actually contaminated the property with lead. Axel's failure to point to any evidence in this extensive record to support the assertion that other parties did in fact use lead speaks volumes.

Axel has thus failed to allege facts or produce evidence necessary to show that it, like the plaintiff in Rumpke , "did nothing to contribute to the presence of the hazardous substances." 107 F.3d at 1239. That case thus provides no support for Axel's argument that it qualifies as an "innocent party" who can assert a § 107 action. Furthermore, the Akzo court, the first to suggest an "innocent party" exception, expressly rejected the contention that a person assertedly responsible for only part of the contamination at a property can bring a § 107 action with respect to the cleanup of the rest of the property. See 30 F.3d at 763-64. This is precisely the contention that Axel makes in the instant case. The Seventh Circuit in Akzo found this argument to be meritless, stating that "Akzo has experienced no injury of the kind that would typically give rise to a direct claim under section 107(a) -- it is not, for example, a landowner forced to clean up hazardous materials that a third party spilled onto its property or that migrated there from adjacent lands. Instead, Akzo itself is a party liable in some measure for the contamination at the Fisher Calo site." Id. at 764. The same reasoning applies here. Axel, like Akzo, is not a landowner forced to clean up hazardous materials that migrated from adjoining lands, but rather is admittedly "a party liable in some measure for the contamination" at the property. Id. (emphasis added). Akzo teaches that a party in these circumstances cannot bring a § 107 action.

11

Axel attempts to avoid its failure to fit within the "innocent party" exception by arguing that each of the tanks and spill areas for which it claims not to be responsible should be regarded as a separate "facility" under CERCLA. With respect to each of those separate "facilities," Axel alleges it is innocent and therefore entitled to bring a § 107 action.

CERCLA defines facility broadly to include:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C.A. § 9601(9).

This definition applies not only to traditional waste sites, see Uniroyal Chem. Co. v. Deltech Corp., 160 F.3d 238, 245 (5th Cir. 1998), but also to "any `area' in and around which hazardous substances have `come to be located,'" United States v. Carolina Transformer Co., 978 F.2d 832, 836 (4th Cir. 1992); Nurad, 966 F.2d at 842-43. No court has held, however, that any area that could qualify as a facility under the definition must be considered a separate facility. This position, which Axel's complaint adopts, would mean that "each barrel in a landfill is a separate facility" -- a proposition that a case upon which Axel itself relies has aptly described as "ridiculous." Union Carbide Corp. v. Thiokol Corp. , 890 F. Supp. 1035, 1043 (S.D. Ga. 1994); see also Akzo Coatings, Inc. v. Aigner Corp., 960 F. Supp. 1354, 1359 (N.D. Ind. 1996).

Nevertheless, Axel apparently advances such a theory. It cites as authority Judge Boggs's statement (for himself alone), that "an area that cannot be reasonably or naturally divided into multiple parts or functional units should be defined as a single `facility.'" Township of Brighton, 153 F.3d at 313. From this, Axel argues that because the Refinery property can be divided into separate functional units, each

12

such unit must or should be designated as a separate facility. That a property could be divided in this way does not, however, mean that it must be so divided for CERCLA purposes. It may well be true, as Judge Boggs suggests, that in order for a property to be divided into separate facilities, it must be reasonably or naturally divisible, but the mere possibility of such division does not in itself require consideration of the site's different parts as separate facilities or make consideration of the property as a single facility impermissible.

Ultimately recognizing the untenability of the contention that anything that could be designated as a separate facility must be so designated, Axel moderates its argument somewhat in its reply brief by suggesting that all the tanks and associated spill areas for which it disclaims responsibility should be regarded as a single, distinct facility. This might be a valid argument if the tanks and their associated spill areas were the only contaminated parts of the property. See Nurad, 966 F.2d 842-43. But it is unambiguously clear from the record that this is not the case -- rather, uncontroverted evidence indicates contamination throughout the property. Axel itself acknowledges that in addition to the tanks and their spill areas, the furnace refractory burial area and two other areas "requir[e] soil investigation and cleanup." Brief of Appellant at 16 n.13. Moreover, Axel's attempt to refute the evidence of widespread contamination at the property by reference to its own experts' report is singularly unsuccessful. According to Axel, this report states that except for the soil at the furnace refractory burial area, the soil at the property was contaminated not by hazardous substances but by petroleum products that are exempted from the CERCLA definition of hazardous substances. See 42 U.S.C.A. § 9601(14). In fact, the report acknowledges elevated levels of lead in two other places on the property as well. Finally, Axel utterly fails to controvert the record evidence of lead contamination in the pipelines that run throughout the property.

These places containing uncontested contamination are, furthermore, scattered across the Refinery property. The pipelines, as noted, run throughout the property, but are predominately located in the northwest region where most of the contaminated tanks are situated. The unpaved maintenance area is in the northeast region, the furnace refractory burial area is in the southeast region, and the former sludge pile and the other acknowledged area of contamination are in the

13

southwest region. The property as a whole is not notably large (thirteen acres), and Axel does not attempt to argue that these contaminated locations are too distant from each other to be regarded as parts of a single pattern of contamination. Thus, even without considering the tanks and spill areas for which Axel seeks to avoid responsibility, the evidence shows that contamination is widespread throughout the property.

Courts have uniformly refused to divide widely contaminated properties like the one at issue here into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property. For example, the district court in Akzo faced an argument, made by defendants who claimed to be liable for contamination only in one area, that "because the Site can be divided into five distinct geographic areas, each area is a distinct facility." 960 F. Supp. at 1358. The court rejected this argument because there was "no dispute that hazardous wastes have `otherwise come to be located' in several locations at the Site." Id. Similarly, in Northwestern Mutual Life Insur. Co. v. Atlantic Research Corp. the court refused to accept the same kind of argument, stating that "[w]hat matters for the purposes of defining the scope of the facility is where the hazardous substances . . . `[have] otherwise come to be located.' . . . And in this regard, the uncontradicted record confirms that hazardous substances exist . . . in all quadrants of the property." 847 F. Supp. 389, 395-96 (E.D. Va. 1994). The same is true in Axel's case.

Our opinion in Nurad does not suggest a different conclusion. That case also involved contamination associated with storage tanks, and we held there that "the only `area' where hazardous substances have `come to be located' is in and around the storage tanks, so the relevant `facility' is properly confined to that area." 966 F.2d at 842-43. Here, by contrast, hazardous substances are not located only in the storage tanks and their associated spill areas; rather, they are located throughout the property. Furthermore, our holding in Nurad was directed at preventing parties other than those who had authority over a contaminated area from being subjected to CERCLA liability through irrationally broad understandings of "facility." See id. at 843. Here it is undisputed that Axel had authority over the entire property during a period when hazardous substances were deposited there, and that hazardous substances have "come to be located" throughout the property.

14

Nurad is therefore entirely consistent with the conclusion the entire property here is appropriately considered a single CERCLA facility.

Moreover, the Nurad holding also depended on the fact that "[d]uring the relevant period . . . the site was subdivided and separate portions of it were leased out to individual tenants," id. at 843, whereas the case at hand presents no equivalent facts. Axel owned portions of the Refinery property from 1971 to 1974, but the property was never -- during Axel's ownership or later-- subdivided and leased to different tenants. Furthermore, the entire Refinery property was at all relevant times operated by a single party, and both the EPA and Axel itself treated the entire property as a single facility for CER-CLA remediation purposes in the consent decree that they signed. Cf. New Castle Co., 111 F.3d at 1124 n.8 (party who, like Axel, signed CERCLA consent decree but did not thereby admit CERCLA liability was nonetheless "a potentially responsible person who `resolved its liability to the United States,'" and was therefore "required to use sec-tion 113, and only section 113, to obtain an equitable redistribution of liability among other potentially responsible persons"). Under these circumstances, the property "cannot be reasonably or naturally divided into multiple parts or functional units," and therefore -- according to the very principle that Axel urges upon us -- it "should be defined as a single `facility,' even [though] it contains parts that are non-contaminated." Township of Brighton , 153 F.3d at 313.

This is not to say that every widely contaminated property must be considered a single facility. But where, as here, the only arguments in favor of designating multiple facilities are weak in themselves and merely represent thinly-veiled attempts by a party to avoid responsi-bility for contamination, designation of the property as a single facil-ity is appropriate. Allowing such arguments to prevail would undercut the strict liability scheme created in CERCLA by importing consider-ations of actual liability or responsibility for contamination into the analysis of whether a party should be held to fall within § 107(a) as an initial matter. See Akzo, 960 F. Supp. at 1359. Such considerations are appropriately addressed not in determining what constitutes the facility in the case, but rather in deciding whether a party is entitled to one of the defenses, whether the harm is divisible, and whether contribution is available. See Township of Brighton, 153 F.3d at 313.

15

The district court therefore did not err in ruling that Axel is a potentially responsible person that cannot bring a § 107 action. Although the district court only granted summary judgment on this basis to CCO, Axel's inability to bring a § 107 claim pertains as well to its § 107 claim against Carroll. We therefore need not reach the question of whether, as the district court held, Carroll was entitled to CERCLA's lender-liability exemption with respect to Axel's § 107 claim.

III.

Axel also asserted a claim for contribution against Carroll and CCO under § 113 of CERCLA, 42 U.S.C.A. § 9613(f)(1). That claim has, however, been rendered moot by the entry of a consent decree signed by Carroll, CCO, and the EPA.

CERCLA provides that parties who have resolved their CERCLA liability to the United States in judicially approved settlement agreements shall not be liable for contribution "regarding matters addressed in the settlement." Id. at 9613(f)(2). After this appeal was filed but prior to oral argument, Carroll and CCO entered into such an agreement with the United States in the form of a proposed consent decree. Carroll and CCO then moved to hold this appeal in abeyance until the district court had approved or rejected the agreement. In a supporting memorandum, Carroll and CCO maintained that approval of the agreement would moot Axel's contribution claims. Rather than responding directly to this contention, Axel denied that the agreement had any bearing on the appeal. Axel also stated in its opposition to the motion that its response should not be construed as an admission that the approved agreement would moot its contribution claims.

After we denied the motion to hold the appeal in abeyance and heard oral argument, the District Court for the Eastern District of North Carolina approved and entered the consent decree. On July 1, 1999, the United States notified us that the decree had been approved. This notification, which was served on Axel, states that "[a]s the parties have explained, the Consent Decree provides contribution protection to Linda Carroll and Carroll Carolina Corp. and will moot the contribution claims of Axel Johnson, Inc., against those defendants."

16

Axel filed no objection or response to this notice. Accordingly, we assume that Axel now concedes that its contribution claims are moot.

Because Axel's § 107 action was properly dismissed, the remaining questions originally appealed -- Carroll's entitlement to the lender liability exemption and CCO's entitlement to the third party defense -- could only pertain to Axel's claim for contribution. Because that claim is moot, we need not address those questions.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

17