**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 28 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SIERRA CLUB,

        Plaintiff-Appellant,

    v.

SEABOARD FARMS INC. and
SEABOARD CORPORATION,
Delaware corporations, and
SHAWNEE FUNDING LIMITED
PARTNERSHIP, a Delaware
partnership,

        Defendants-Appellees.

---

TYSON FOODS INC.,

        Amicus Curiae.

No. 03-6104

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CIV-00-997-C)**

---

Barclay B. Rogers (Patrick Gallagher and David Bookbinder with him on the briefs), Sierra Club, San Francisco, CA, for Appellant.

Ellen B. Steen (Richard E. Schwartz and Kirsten L. Nathanson with her on the brief), Crowell & Moring LLP, Washington, DC, for Appellee.

Judith A. Villines, Stites & Harbison, PLLC, Frankfort, Kentucky, and Laura D. Keller, James W. Taylor, and W. Blaine Early, Stites & Harbison, PLLC, Lexington, Kentucky on the brief for Amicus Curiae.

---

Before **HENRY** , **BRISCOE** , and **HARTZ** , Circuit Judges.

---

**HENRY, J.** ,

---

Sierra Club, Inc. appeals from the district court's grant of summary judgment to the defendants, Seaboard Farms Inc., Seaboard Corporation, and Shawnee Funding Limited Partnership (together, "Seaboard"), who own and operate a pig-farming operation in western Oklahoma. This case turns on the meaning of the word "facility" as used in the Comprehensive Environmental Response, Compensation, and Liability Act's section 103(a) ("CERCLA"), 42 U.S.C. § 9603(a).

CERCLA's Section 103(a) sets out various reporting requirements for the release of hazardous substances from a facility; here we focus on the ammonia emissions from Appellee's concentrated animal feeding operation located in western Oklahoma. CERCLA's statutory definition of this term is somewhat turbid, but, when read with other provisions nearby, is unambiguous. The district court found that the term "facility" should be narrowly construed so as to apply to

each individual barn, lagoon, and land application area as an individual facility. We are led to the contrary conclusion because another part of the statute's text provides a catch-all provision that encompasses Seaboard's entire production site. Therefore, we reverse the district court order and remand for further proceedings.

## I. BACKGROUND

Defendant Seaboard Corporation, a publicly traded Delaware corporation, wholly owns Seaboard Farms, Inc., an Oklahoma corporation, and, through two single-member limited liability corporations, owns Shawnee Funding Limited Partnership (collectively, "Seaboard"). Seaboard owns and operates the Dorman Farm, in Beaver County in western Oklahoma, which comprises two farms located on contiguous sections of land, Dorman North and Dorman South. Each farm includes eight buildings and uses a common waste management system. Together, Dorman North and Dorman South house approximately 25,000 swine. Each building is separated by 40 to 100 feet.

At issue are the emissions from Dorman Farm's waste management system, which includes several lagoons, barns, and land application areas. Sierra Club alleges that Seaboard knew of the Dorman Farm's ammonia emissions and failed to report them as required under CERCLA. Arguing that the ammonia emissions from the Dorman Farm exceeded CERCLA's "reportable quantity" ("RQ") of one hundred pounds per day, Sierra Club maintains that Seaboard had a duty to

-3-

comply with § 103(a)'s immediate reporting requirements. *See* 40 C.F.R. § 302.4 (designating reportable quantities of hazardous substances).

In response, Seaboard argues that Sierra Club misconstrues the definition of the word "facility." Seaboard maintains that the Dorman Farm houses numerous individual facilities, in each of the various lagoons, barns, and land application areas. Under this theory, because each lagoon, barn, and land application area is a separate facility, Seaboard is obligated to report under § 103 only if the ammonia emissions for *each* individual facility exceed one hundred pounds per day.

The district court initially agreed with Seaboard's reasoning, based on an EPA manual. The district court concluded that "facilities [we]re intended to be separate buildings, structures . . . lagoons," Aplt's App. vol. II, doc. 16, at 8 (Dist. Ct. Order, filed Feb. 5, 2002), but it nevertheless concluded that Seaboard was required to "aggregate the amount of ammonia being released at the Dorman Sow Farm in order to determine if [it was] required to report the emissions under CERCLA." *Id.* at 10. In reviewing Seaboard's motion to reconsider, the district court reexamined the record, reversed its earlier ruling regarding aggregation, and granted the reconsideration. In so doing, the court determined that Seaboard "should not be required to aggregate amounts of ammonia release from separate

facilities at Dorman which did not meet the RQ limit." *Id.,* doc. 23, at 4 (Dist. Ct. Order, filed July 18, 2002).

Subsequent to this ruling, the parties entered into a Consent Decree that addressed all of Sierra Club's claims, with the exception that Sierra Club could appeal the district court's ruling on the question of Seaboard's liability for failure to report ammonia emissions under § 103(a) of CERCLA. In making this determination, the primary issue before us is whether or not the district court's interpretation of the term "facility" is correct.

## II. DISCUSSION

In interpreting § 103, we must first determine whether the plain language of the statute is ambiguous. Suspecting that the EPA might have an opinion as to what a "facility" means in § 103, we invited the agency to participate by submitting a brief. It declined, because of insufficient time to work with the Department of Justice and prepare a brief before scheduled oral argument; it offered to consider our invitation post-argument. Because we hold the term to be unambiguous, and we need not defer to the EPA's interpretation, no further assistance is necessary. Our holding is supported by the text of the statute, its remedial purpose, and caselaw that has construed the term "facility" in other contexts.

**A. Standard of Review**

"We review the grant or denial of summary judgment de novo, applying the standard applied by the district court pursuant to Fed. R. Civ. P. 56(c)." *Mesa Oil, Inc. v. Ins. Co. of N. Am.*, 123 F.3d 1333, 1337 (10th Cir. 1997). Under that standard, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. If the movant bears the burden of showing the absence of a genuine issue of material fact, the non-movant may not rest on its pleadings but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. *Id.*

**B. Section 103(a)**

"[T]he starting point in every case involving construction of a statute is the language itself." *Greyhound Corp. v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330 (1978) (internal quotation marks omitted). Section 103 of CERCLA requires that

> Any person in charge of a vessel or an offshore or an onshore facility *shall,* as soon as he has knowledge of any release (other than a federally permitted release) *of a hazardous substance from such vessel or facility* in quantities equal to or greater than those determined pursuant to section 9602 of this title, *immediately notify the National Response Center established under the Clean Water Act* [33 U.S.C.A. § 1251 et seq.] of such release. The National Response Center shall convey the notification expeditiously to all appropriate Government agencies, including the Governor of any affected State.

42 U.S.C. § 9603(a) (emphasis supplied). Ammonia ($NH_4$) is a hazardous substance under § 102 of CERCLA. *See* 40 C.F.R. § 302.4. The EPA-defined reportable quantity for ammonia is one hundred pounds per day.

As to the term "facility," we will not extrapolate a definition when one has been provided in the text of the statute. CERCLA defines "facility" as

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, **or** (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. §§ 9601(9) (emphasis supplied).

### C. Is the Statute Unambiguous?

We must first determine whether the statutorily-defined term "facility" is unambiguous. That is, we must decide, using the analytic framework set out in *Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), "whether Congress has directly spoken to the precise question at issue." *Pharmanex v. Shalala,* 221 F.3d 1151, 1154 (10th Cir. 2000) (internal quotation marks omitted). "If so, that is the end of the matter, and Congress' clear intent controls. If the statute is silent or ambiguous as to the specific issue before us, then we must defer to the agency's interpretation, if it is based on a permissible construction." *Id.*

We agree with the district court that the definition appears clear, concise and straightforward, delineating examples of facilities in subpart (A) ("      any building, structure, installation, equipment, pipe or pipeline . . . well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft," 42 U.S.C. § 9601(9)(A)). Thus, Seaboard argues that each barn (or lagoon) is a separate facility, and unless the emissions from each barn exceed one hundred pounds per day, no reporting is required. But we also conclude that the statute provides a catch-all provision in subpart (B) ("any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located," *id.* § 9601(9)(B)).

We note that the district court did not appear to address subpart (B) in its orders. Although we agree with the district court that subpart (A) is clear, it must be read with subpart (B), wherein we interpret the definition of "facility" to dictate an unequivocal answer to the issue at hand. Applying the normal principles of statutory construction, subpart (B) encompasses "any site or area where a hazardous substance" has "come to be located." Giving "effect to the unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843, we must hold that the entire contiguous Dorman site is thus included.

We acknowledge that the District Court for the Western District of Kentucky reached the opposite conclusion than did the district court here, which

-8-

might support a finding of ambiguity in the statute. *See United States v. Quarrell,* 310 F.3d 664, 669 (10th Cir. 2002) ("A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. If an ambiguity is found, a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history. A court can also resolve ambiguities by looking at the purpose behind the statute.") (internal quotation marks and citations omitted). In *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F. Supp. 2d 693 (W.D. Ky. 2003) (hereinafter *Tyson*), the district court accepted Sierra Club's argument that the term "facility" included every poultry house or litter shed at the farm, and that the "whole farm site is the proper regulated entity for purposes of the CERCLA . . . reporting requirements." *Id.* at 708. Although the district court below reached a different conclusion, its reasoning was based entirely on § 101(9)(A), and not on § 101(9)(B), which would include "any site or area where a hazardous substance has been deposited." § 101(9)(B). Thus, the divergent views of the two courts does not change our conclusion that the term "facility" is unambiguous.

### D. Seaboard's Arguments

Having concluded that the term facility is unambiguous and encompasses the entire Dorman site, we turn to Seaboard's counter-arguments that the term "facility" should be construed narrowly. We consider (1) the text of the statute,

(2) the purpose of the statute, the (3) federal courts' interpretations of the definition of the term "facility," and (4) the EPA's various interpretations that touch upon the issue.

### 1. Statutory definition

Turning to the plain text of the statute, we find it telling that the conjunction linking subparts (A) and (B) is "or," thus providing two distinct definitions of what might constitute a facility. "An area fulfilling the requirements of part A need not also meet the requirements of part B to be considered a 'facility,' and vice versa. Consequently, part B should not be read as in any way modifying part A." *United States v. Township of Brighton*, 153 F.3d 307, 322 (6th Cir. 1998) (Moore, J., concurring). Site is defined as "[t]he situation or position of a place, town, building, etc., esp. with reference to the surrounding district or locality." XV THE OXFORD ENGLISH DICTIONARY 562 (2d ed. 1989). "In addition, sites that do not otherwise satisfy the definition are swept within its purview by a catch-all phrase that applies to 'any site or area where a hazardous substance . . . otherwise comes to be located.'" *Uniroyal Chem. Co., Inc. v. Deltech Corp.*, 160 F.3d 238, 245 (5th Cir. 1998) (quoting 42 U.S.C. § 9601(9)(B)).

We hold that the two-part disjunctive definition of "facility" means whatever is appropriate for the facts at hand: not only "(A) any . . . pit, pond,

lagoon, impoundment, [or] landfill . . . ," but also "(B) any site or area where a hazardous waste substance has been deposited . . . or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). "Simply put, the term 'facility' includes every place where hazardous substances come to be located." *United States v. Conservation Chem. Co.*, 619 F. Supp. 162, 185 (W.D. Mo. 1985).

This interpretation is supported by the only other federal court to directly address this issue. *See Tyson*, 299 F. Supp. 2d at 708. The *Tyson* court acknowledged the Western District of Oklahoma's contrary findings, but concluded

> that a whole chicken farm site is a facility from which releases must be reported under CERCLA. First, Defendants are correct that CERCLA § 101(9)(A), defines facility to mean "any building, structure, installation, equipment,. . . ." 42 U.S.C. 9601(9)(A). *But in relying on this provision, they ignore CERCLA § 101(9)(B)* which defines a facility as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9)(A). *Under CERCLA § 101(9)(B), the entire farm site, including all the chicken houses on a single site, qualifies as a facility.*

*Id.* (emphasis supplied). We agree with the *Tyson* court that subsection § 101(9)(B) provides a catch-all alternative provision to capture sites that are not specifically identified in subsection (A).

### 2. Remedial Purposes of CERCLA

CERCLA's broad remedial purposes further support our holding. *See Uniroyal Chem Co.,* 160 F.3d at 257 ("Numerous courts . . . have recognized that

CERCLA is a broad remedial statute.") (collecting cases). "Congress enacted CERCLA to facilitate the expeditious cleanup of environmental contamination caused by hazardous waste releases." *Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1533 (10th Cir. 1992).

To facilitate its remedial goals, CERCLA "establishes several mechanisms to respond to releases or threatened releases and delineates the respective powers and rights of governmental entities and private parties." *Id.* A primary step in holding parties responsible for disposal problems is the notification process provided in § 103. CERCLA provides the EPA with "a variety of tools for achieving the efficient and cost-effective cleanup of the nation's hazardous waste sites." *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 147 (3d Cir. 1999).

We agree with Sierra Club's assertion that CERCLA, which was enacted "[i]n 1980 . . . in response to the serious environmental and health risks posed by industrial pollution," must be interpreted liberally so as to accomplish its remedial goals. *United States v. Bestfoods*, 524 U.S. 51, 55 (1998); *Atl. Richfield Co. v. Am. Airlines, Inc.*, 98 F.3d 564, 570 (10th Cir. 1996) ("We note that because CERCLA is remedial legislation, it should be construed liberally to carry out its purpose."). The EPA states that "a major purpose" of § 103 is "to alert the appropriate government officials to releases of hazardous substances that may

-12-

require rapid response to protect public health and welfare and the environment." 50 Fed. Reg. 13,456 (April 4, 1985) (final rule). Consistent with a liberal construction to further CERCLA's purposes, the *Bestfoods* Court affirmed that "the term 'facility' enjoys a broad and detailed definition." 524 U.S. at 56 (citing § 101(9) in an action brought under CERCLA § 107, 42 U.S.C. § 9607).

Seaboard argues that "[t]he statutory goal of immediate notification and emergency response would *not* be served by a broad, site-wide interpretation of the term 'facility.'" Aple's Br. at 18 (emphasis supplied). Seaboard emphasizes that the definition of "facility" provided in another statute, the Emergency Planning and Community Right-to-Know Act (EPCRA), requires a broad interpretation. EPCRA defines "facility" as

> *all* buildings, equipment, structures, and other stationary items which are located on a single site or on contiguous or adjacent sites and which are owned or operated by the same person (or by any person which controls, is controlled by, or under common control with, such person). For purposes of section 11004 of this title, the term includes motor vehicles, rolling stock, and aircraft.

42 U.S.C. § 11049(4) (emphasis added).

EPCRA's notification requirements "provide citizens with accurate information [regarding] *all releases* of toxic chemicals at a site for informational purposes." Aple's Br. at 27 (emphasis added). "EPCRA establishes a framework of state, regional and local agencies designed to inform the public about the presence of hazardous and toxic chemicals, and to provide for emergency

-13-

response in the event of health-threatening releases." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998). EPCRA's hazardous substances include more than two hundred EPCRA hazardous substances, including hydrogen peroxide and sulfur dioxide, that are not CERCLA hazardous substances. 40 C.F.R. §§ 302.4, 355.

Seaboard maintains that, in contrast, CERCLA's § 103(a) does not contemplate widescale aggregated reporting, but rather it was designed to assure immediate notification of RQs released from a discrete location. Seaboard contends that by adopting a broader definition in EPCRA (covering "*all*" buildings etc.), CERCLA's narrower definition ("*any*" building) must be given some meaning. Seaboard argues that, unlike § 103, CERCLA's §§ 104 and 107 address the "cleanup management" and liability purposes that should be construed broadly to "maximize site cleanup efficiency." Aple's Br. at 20. Rather, the notification requirements under § 103 would be "best served by a focus on discrete locations," and thus "facility" for purposes of § 103 means each individual barn, lagoon, etc. *Id.* at 28.

We find Seaboard's arguments unconvincing. CERCLA contains no language limiting § 103 or limiting § 101(9)'s definition of "facility" in such a way. In fact, the EPA's interpretation of violations of this section appear quite strict. *See In re Genicom Corp.,* 1992 WL 204414, at *4 (E.P.A. July 16, 1992)

-14-

(where defendant failed to report releases from the storage tank of the wastewater treatment plant facility, EPA's assessment of penalties for violation of § 103's notification requirement was justified), *aff'd*, *In re Genicom Corp.*, 4 E.A.D. 426 (E.P.A. Dec. 15, 1992).

### 3. The Federal Courts' Treatment of "Facility"

Seaboard contends that the federal courts that have considered the breadth of the term "facility" did not do so in the context of § 103, and thus, are not instructive. We recognize that, with the exception of *Tyson*, none of these cases that have explored the definition of "facility" were § 103 reporting requirements cases. However, we agree with the *Tyson* court that we "can find no rational reason to disregard these cases in discussing the definition of the term 'facility' in a Section 103 reporting case." 299 F. Supp. 2d at 709. First we consider (a) various federal courts' interpretations of "facility" under other sections of CERCLA, and next, (b) the relevance of Congress's use of the identical term throughout the statute.

### a. Other sections of CERCLA

Both sides agree that the circuits that have applied the defined term "facility" have done so with a broad brush. *See Uniroyal Chem. Co.*, 160 F.3d at 245 (applying broad definition of facility in an action under § 107 and stating "[i]n examining the contours of § 9601(9), it is apparent that *facility is defined in*

*the broadest possible terms*, encompassing far more than traditional waste sites. It expressly includes buildings, pipelines, motor vehicles, rolling stock, wells, and aircraft. 42 U.S.C. § 9601(9)(A).") (emphasis supplied); *United States v. Rohm and Haas Co.*, 2 F.3d 1265, 1279 (3d Cir. 1993) (examining liability under § 107 and noting "we think it evident from the broad statutory definition of 'facility' that Congress did not intend EPA to be straight-jacketed in this manner in situations involving a release transcending property boundaries"); *3550 Stevens Creek Assocs. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1360 n.10 (9th Cir. 1990) (determining liability under § 107 and noting broad construction of the term "facility," "such that in order to show that an area is a 'facility,' the plaintiff need only show that a hazardous substance under CERCLA is placed there or has otherwise come to be located there") (internal citations omitted); *New York v. Shore Realty Corp*., 759 F.2d 1032, 1043 n.15 (2d Cir. 1985) ("CERCLA defines the term 'facility' broadly to include any property at which hazardous substances have come to be located"); *see also Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1525 (10th Cir. 1995) (In a § 9607 action, "[t]he EPA designated the Ekotek *Site* [consisting of three surface impoundments, piles and pits of waste material, underground tanks, and an underground drain field] a CERCLA facility pursuant to 42 U.S.C. § 9601(9) because of contamination by hazardous substances.") (emphasis supplied).

In a § 107 action, the Fourth Circuit noted that simply because "a property could be divided [into multiple facilities] does not, however, mean that it must be so divided for CERCLA purposes." *Axel Johnson, Inc. v. Carroll Cardina Oil Co.*, 191 F.3d 409, 418 (4th Cir. 1999). There, the hazardous substances were not located only in the storage tanks and their associated spill areas; rather, they were located throughout the property. The court, after noting the "untenability of the contention that anything that could be designated as a separate facility must be so designated," applied the broad definition of facility, and noted that "[n]o court has held . . . that any area that could qualify as a facility under the definition *must* be considered a separate facility." *Id.* at 417-18 (emphasis supplied); *see also Tyson*, 299 F. Supp. 2d at 709 (treating a plant or "an area [that] is managed as a whole . . . [as] a single facility for CERCLA purposes").

We recognize that in a § 107 action, the hazardous substances may have contaminated large parts of a plant, while initially being emitted from only one tank. *See Axel Johnson*, 191 F.3d at 417. However, the underlying purpose of § 103, that is, the alerting of government officials of a potential hazardous substance release that may require federal and local government response assistance, is best served through treating the Dorman Farm as a single facility. Solely owned by Seaboard, it is managed and operated as one facility, with one particular site purpose (producing swine products). *See also Akzo Coatings, Inc.*

-17-

*v. Aigner Corp.*, 960 F. Supp. 1354, 1359 (N.D. Ind. 1996) (rejecting the argument that each contamination source is a separate facility because such argument "could have disastrous consequences, for ultimately every separate instance of contamination, down to each separate barrel of hazardous waste, could feasibly be construed to constitute a separate CERCLA facility"), *aff'd in part, vacated in part by*, 197 F.3d 302 (7th Cir. 1999); *Quaker State Minit-Lube,* 52 F.3d at 1525 (10th Cir. 1995) (entire site, which consisted of surface impoundments, piles and pits of waste material, underground tanks, and an underground drain field considered a facility for § 9607); *Cytec Indus. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 836 (S.D. Ohio 2002) ("This court concludes that usually, although perhaps not always, the definition of facility will be the entire site or area, including single or contiguous properties, where hazardous wastes have been deposited as part of the same operation or management."); *Clear Lake Props. v. Rockwell Int'l Corp.*, 959 F. Supp. 763, 767-68 (S.D. Tex. 1997) (rejecting an attempt to create unnatural boundaries between a building and the site on which it is located).

   b. Identical words used in different parts of CERCLA

  Little caselaw addresses the emergency notification purposes of § 103. Despite this dearth of caselaw, Seaboard can point to no evidence that Congress

intended for the statutorily defined term "facility" to assume a different meaning when used in different sections of CERCLA.

The Supreme Court has recognized that it is a "normal rule of statutory construction . . . that identical words used in different parts of the same act are intended to have the same meaning." *Sorenson v. Sec'y of the Treasury*, 475 U.S. 851, 860 (1986) (internal quotation marks omitted). When Congress uses a technical term in a statute, it is presumed that it has intended that the term have the same meaning in each of the sections or subsections. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 576 (1995) (concluding that the term "prospectus" had the same meaning under two different sections of the Securities Act of 1933).

Furthermore, we recognize that this "'normal rule of statutory construction' applies with particular force where Congress has specifically defined the term," as here. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1381 (Fed. Cir. 2001). *See Sorenson*, 475 U.S. at 851 (rejecting a taxpayer's argument that the definition of the term "overpayment" in one section of the Internal Revenue Code did not apply to the use of the term in a separate but related code section); *see also, e.g., Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (noting the "basic canon of statutory construction that identical terms within an Act bear the same meaning"); *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (reaffirming the

presumption that "identical words used in different parts of the same act are intended to have the same meaning").

As the *Tyson* court notes, "CERCLA defines 'facility' once in the definition section of the statute and its meaning should be interpreted consistently throughout the entire statute. Accordingly, 'facility' for reporting purposes, cleanup purposes or any other statutory purpose extend [sic] to the bounds of the contamination." *Tyson*, 299 F. Supp. 2d at 299. "We therefore presume that Congress intended that the term have the same meaning in each of the pertinent sections or subsections of the statute . . . ." *SKF USA*, *Inc.*, 263 F.3d at 1382.

### 4. EPA's Interpretations of Facility

Both sides refer to various EPA "interpretations" of § 103 for support. The EPA has touched on this section in various places, including (a) an EPA publication titled "EPA Reporting Requirements for Continuous Releases of Hazardous Substances, A Guide for Facilities on Compliance, 1997"; (b) the preamble to the proposed and final rule, regarding notification requirements; (c) the final rule regarding continuous releases; and (d) various comments and responses to the notification requirements rulemaking procedure. To the extent these regulatory materials do address the term "facility," generally, the EPA's interpretation appears to cut both ways. *See Tyson*, 299 F. Supp. 2d at 710 (noting that "both parties cite EPA regulations and guides in support of their

respective positions . . . and find[ing] arguable support for both of their positions").  Because we have interpreted § 101(9) to be unambiguous, we need not consider the EPA's ruminations.  We owe the EPA's interpretations no deference under *Chevron.  See Nat'l R.R. Passenger Corp. v. Boston and Maine Corp.*,  503 U.S. 407, 415 (1992) (concluding that statute "is unambiguous in light of its language and history, and so no deference was due" under *Chevron*).

### III. CONCLUSION

We hold that the plain language of CERCLA's § 101(9)(A) and (B) is unambiguous and unequivocal.  Given this clear expression of Congress's intent, § 103's use of the term "facility" encompasses the Dorman site as a whole.  The disjunctive language of § 101(9), CERCLA's remedial purpose, and the federal courts' broad interpretation and application of § 101(9) further bolster a definition of a "facility" that encompasses the entire Dorman Farm site.  Accordingly, we REVERSE and REMAND to the district court for proceedings consistent with this opinion.  The motion of Tyson Foods, Inc. for leave to file an amicus brief is granted.

03-6104 -  Sierra Club v. Seaboard

**HARTZ** , Circuit Judge, concurring in part and dissenting in part:

I concur in reversal and remanding to the district court, but I do not join the panel opinion.  Although there is much with which I agree in that opinion, I read the controlling statutory provision—CERCLA § 101(9), 42 U.S.C. § 9601 (9)—differently than does the majority.  In my view, whether the Dorman Farm constitutes a "facility" depends on whether a "hazardous substance," within the definition of the term in CERCLA § 101(14), 42U.S.C. § 9601(14), has been deposited on the farm.  Perhaps the hog waste is a "hazardous substance"; or perhaps ammonia within the waste fits the definition.  But this issue has not been briefed or argued by the parties and should be addressed on remand.

Seaboard allegedly violated CERCLA § 103, 42 U.S.C. § 9603.  That section requires "[a]ny person in charge of a . . . facility" to report promptly "any release . . . of a hazardous substance from [the] facility" in quantities above certain established levels.  *Id.*  "Facility" is defined as follows by CERCLA § 101(9):

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

At first glance, part (B) of the definition appears to subsume part (A)—any facility described in part (A), such as a building or a lagoon, is on a "site" or "area" and thus is encompassed by part (B) of the definition. But there is a qualifier in part (B) that does not apply to part (A). To qualify as a "facility" under part (B) of the definition, the site or area must be a place "where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." Thus, a building, say a coal-fired power plant, could be covered by part (A) but not by part (B) if hazardous waste is not located in the plant. The hazardous waste might be produced by burning the coal and is then emitted into the atmosphere. Perhaps one could say that such waste "has . . . come to be located" in the power plant because it resides (briefly) in the smokestack before being emitted; but that would strike me as a stretch of the statutory phrase. In common usage we would not say that an item has been placed or come to be located in a conduit that it passes through in an instant. Moreover, if "placed, or otherwise come to be located" is interpreted to include such a transient passage, one wonders what the purpose of part (A) is; whenever a hazardous substance is released from an item (other than a vehicle) listed in part (A), that item would be on a site that satisfies part (B).

If my reading of § 101(a) is correct, then the result in this case depends on whether the animal waste (or ammonia within it) at Dorman Farm is a "hazardous

substance." If it is not a hazardous substance, then only part (A) of the definition of "facility" applies. And I see no way to interpret any of the components of the part (A) definition to encompass the entire farm. Those components are discrete objects—a building, a pipe, a pond, etc. No liberal definition of the word "building" could reasonably include a group of dispersed buildings.

On the other hand, if the animal waste *is* a "hazardous substance," part (B) of the definition of "facility" applies, and it would be appropriate to treat the entire farm as a "site" or "area." The opinions relied on by the panel opinion in support of an expansive interpretation of the definition of "facility" all relate to part (B) of the definition.

My reading of § 101(9) is also consistent with an EPA statement relied on by Seaboard. The statement relates to reporting requirements under CERCLA § 103. A person in charge of a facility must report any known release of a reportable quantity (RQ) of a hazardous substance from the facility. Releases are aggregated over a 24-hour period to determine whether they reach the RQ. In an introductory statement accompanying its final rule on "Notification Requirements: Reportable Quantity Adjustments," 50 Fed. Reg. 13456 (April 4, 1985), the EPA explained that if a plant contains several "facilities," the plant can prepare one report of RQ releases from the entire plant, but whether there has been an RQ release is determined on a facility-by-facility basis. In other words, even if the

release by the entire plant exceeds the RQ, there is no reporting requirement if there was not an RQ release by any single facility. If, however, several facilities at the plant each experienced an RQ release, the plant may submit a single report covering all the releases.

The EPA wrote:

Several commenters discussed the Agency's statement that "for notification purposes, EPA will consider the entire contiguous plant or installation and contiguous grounds under common ownership to be the reporting facility rather than each vent, pipe, or piece of equipment at such a plant" (48 FR 23553). Some of the commenters appeared to misinterpret EPA's intentions.

The Agency intended the statement to reflect its belief that numerous concurrent releases (releases occurring within the same 24-hour period) of the same hazardous substance from one contiguous plant or installation need not be reported individually, but should be reported in a single notification. This policy will avoid unnecessary and burdensome calls *where a plant is experiencing more than one reportable release*, because it allows the regulated community to consider multiple concurrent releases of the same substance as one release for reporting purposes.

The comments received favored this policy, although a few commenters suggested that EPA expand the definition of facility to include outdoor areas within the boundary of a plant. In addition, some commenters questioned whether a releaser must aggregate the total volume of concurrent releases in order to determine if a reportable quantity has been met or exceeded.

The "facility" from which a release has entered or may enter into the environment does not include outdoor areas. Rather, the definition of "environment" includes all outdoor (i.e., not completely enclosed) areas surrounding and within a given facility. *All concurrent releases of the same substance from a particular facility into the environment must be aggregated to determine if an RQ has been*

*exceeded. Releases from separate facilities, however, need not be aggregated. EPA intends for multiple concurrent releases of the same substance from a single facility to be reported in a single notification as a single release. Where multiple concurrent RQ releases are occurring at various parts of a contiguous plant or installation on contiguous grounds under common ownership (e.g., at a chemical manufacturing plant or an oil refinery), the person in charge should also report these multiple concurrent releases in a single notification. The policy of consolidating notifications also applies to concurrent releases from separate storage facilities, so long as the releases are at the same location,* i.e., located on contiguous grounds under common ownership.

*Id.* at 13459 (emphasis added). Although this statement is not as clear as one would like, it certainly assumes that a single plant or installation (such as a "chemical manufacturing plant or an oil refinery") might not itself be a "facility" even though it includes several "facilities." *See also* "Clarification of Notification CERCLA Requirements for Facilities" in *Emergency Preparedness and Community Right-to-Know Act - Questions and Answers* (Feb. 1999), at http://yosemite.epa.gov/oswer/ceppoweb.nsf/vwResourcesByFilename/epcra-qa.txt/$File/epcra-qa.txt (stating that releases from two facilities "on contiguous ground under common ownership" should not be aggregated to determine whether RQ has been reached). This makes sense if only part A of the definition of "facility" applies—part (B) (which could well encompass a "site" including the entire plant) being inapplicable because the "hazardous substance" emitted by the plant is not considered to "ha[ve] been deposited, stored, disposed of, or placed,

or otherwise come to be located" there even though it travels through a smokestack or the like.

Having said all this, I add a note of caution. CERCLA is notorious as a complex, poorly crafted statute. What appears to be a straightforward reading of statutory language may fail to take into account important features of the statute. An amicus brief from the EPA would have been helpful.