ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.

In the

# United States Court of Appeals

## For the Second Circuit

_____

August Term 2024

No. 23-7575

ELG UTICA ALLOYS, INC.,

*Plaintiff-Counter*
*Defendant-Appellant,*

*v.*

NIAGARA MOHAWK POWER CORP., DBA NATIONAL GRID,

*Defendant-Counter*
*Claimant-Third Party*
*Plaintiff-Cross Claimant-*
*Cross Defendant-Appellee,*

SPECIAL METALS CORP., EMPIRE RECYCLING CORP.,

*Defendants-Cross*
*Defendants-Appellees,*

GENERAL ELECTRIC COMPANY,

*Defendant-Cross*
*Defendant-Cross*
*Claimant-Appellee,*

CHICAGO PNEUMATIC TOOL COMPANY, LLC,

*Defendant-Cross Defendant-Cross Claimant-Counter Claimant-Appellee,*

NATIONAL GRID GROUP PLC,

*Defendant,*

*v.*

CBS CORPORATION (successor-in-interest to Westinghouse Electric Corporation) AKA PARAMOUNT GLOBAL,

*Third-Party Defendant-Cross Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of New York
No. 16-cv-1523, Brenda K. Sannes, Chief District Judge, Presiding.
(Argued February 6, 2025; Decided July 17, 2025)

Before: PARKER, BIANCO, and NARDINI, *Circuit Judges.*

ELG Utica Alloys, Inc. ("ELG") sued Defendants-Appellees, a group of its former customers, in the United States District Court for the Northern District of New York, asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). ELG remediated contamination at one portion of a 23-acre facility in 2007, and pursuant to a 2015 consent order with the New York State government, continues to remediate contamination at a different portion of the facility. ELG seeks contribution for the costs of the 2015 cleanup from the Appellees, which ELG alleges are also responsible for the contamination. Appellees moved for summary judgment, arguing that the six-

year statute of limitations applicable to certain CERCLA claims had elapsed. The District Court (Sannes, *C.J.*) granted the motion, reasoning that, even though ELG seeks costs only from 2015 onwards, the remediation began in 2007, and the 2015 work was a subsequent step in the work that commenced in 2007. Because the 2015 cleanup was part of the 2007 remediation, the District Court concluded that the statute of limitations started to run in 2007 and elapsed in 2013, which was before ELG sued. The District Court also imposed spoliation sanctions on ELG for shredding over 23,000 pounds of potentially relevant documents.

We agree with the District Court that the statute of limitations on ELG's claims commenced once on-site physical remediation began in 2007. We also see no error in the District Court's imposition of spoliation sanctions. Accordingly, we AFFIRM the judgment of the District Court and REMAND to the District Court to order the agreed-upon spoliation sanction.

PETER T. STINSON, Steven W. Zoffer, Brett W. Farrar, Dickie, McCamey & Chilcote, P.C., Pittsburgh, PA, *and* David L. Cook, Phillips Lytle LLP, Rochester, NY, *for* Plaintiff-Counter Defendant-Appellant ELG Utica Alloys, Inc.

KRISTIN C. ROWE, Dean S. Sommer, Young/Sommer LLC, Albany, NY, *for* Defendant-Cross Defendant-Cross Claimant-Appellee General Electric Company.

Yvonne E. Hennessy, Barclay Damon LLP, Albany, NY, *for* Defendant-Counter Claimant-Third Party Plaintiff-Cross Claimant-Cross Defendant-Appellee Niagara Mohawk Power Corp., DBA National Grid.

James D. Mazzocco, Marc Felezzola, Babst Calland Clements & Zomnir, P.C., Pittsburgh, PA, *for* Third-Party Defendant-Cross Defendant-Appellee CBS Corporation.

Gary S. Bowitch, Castleton, NY, *for* Defendant-Cross Defendant-Appellee Empire Recycling Corp.

MARY L. D'AGOSTINO, Doreen A. Simmons, Hancock Estabrook LLP, Syracuse, NY, *for* Defendant-Cross Defendant-Appellee Special Metals Corp.

Agnieszka Antonian, Connell Foley LLP, New York, NY, *for* Defendant-Cross Defendant-Cross Claimant-Counter Claimant-Appellee Chicago Pneumatic Tool Company, LLC.

BARRINGTON D. PARKER, *Circuit Judge*:

Appellant ELG Utica Alloys, Inc. ("ELG") sued Appellees, a group of its former customers, in 2016 in the United States District Court for the Northern District of New York, asserting claims under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). 42 U.S.C. §§ 9601 *et seq.* ELG's predecessor companies had conducted scrap-metal recycling operations on a 23-acre facility in Utica, New York, which released hazardous chemicals that contaminated soil and groundwater at the site and in nearby areas. ELG remediated the contamination at one portion of the facility in 2007, and pursuant to a 2015 consent order with the New York State government, continues to remediate contamination at a *different* portion of the site. ELG seeks contribution for the costs of the 2015 cleanup from parties who allegedly shared responsibility for the contamination: Appellees Niagara Mohawk Power Corporation ("National Grid"), Special Metals Corporation, Empire Recycling Corporation, General

4

Electric Company, and Chicago Pneumatic Tool Company.[1] Appellees moved for summary judgment, arguing that the applicable six-year statute of limitations to sue for contribution had elapsed.

The District Court (Sannes, *C.J.*) granted Appellees summary judgment, agreeing that the limitations period had elapsed. The District Court reasoned that even though ELG seeks costs only from 2015 onwards, on-site remediation began in 2007, and the 2015 work required by the consent order was a continuation of the 2007 remediation. Consequently, the District Court concluded that the statute of limitations started to run in 2007 and elapsed in 2013—before ELG brought suit. Further, ELG argued that the 2007 remediation occurred on a different facility than the 2015 remediation, which, it contends, means the statute of limitations for the 2015 cleanup could not have started in 2007. But the District Court concluded that both cleanups occurred on the same 23-acre facility (albeit different portions), and therefore, the statute of limitations commenced in 2007. The District Court also imposed spoliation sanctions on ELG for the shredding of over 23,000 pounds of potentially relevant documents.

---

[1] Appellee CBS Corporation was added to the case as a Third-Party Defendant/Cross Defendant in 2019. National Grid and Empire Recycling Corporation both asserted that, to the extent they may be held liable for cleanup costs at the facility, the CBS Corporation is responsible for a share of those costs.

We agree with the District Court that the statute of limitations on ELG's claims commenced once on-site remediation began in 2007. Accordingly, we conclude that the applicable six-year limitations period elapsed in 2013, and ELG's contribution claim is time-barred. We also see no error in the District Court's imposition of spoliation sanctions.

## BACKGROUND

**I.    Factual Background**

**A. The Contamination**

Appellant ELG Utica Alloys, Inc. ("ELG") is the successor to two companies that conducted scrap-metal recycling operations on a 23-acre site in Utica, New York: Utica Alloys, Inc. and Universal Waste, Inc. These two companies coordinated recycling operations and were managed by the same corporate officers before merging to become ELG.

In 1977, the New York State Department of Environmental Conservation ("the DEC") discovered a stockpile of transformers and capacitors at the site and expressed concern that toxic chemicals were leaking into the soil. In 1979, sampling by the DEC confirmed that the site was contaminated with toxic polychlorinated biphenyls ("PCBs") and trichloroethylene ("TCE"). In February

1982, the DEC and the recycling companies (now ELG) entered into an agreement, pursuant to which an environmental impact firm performed a field investigation of all 23 acres of the site. The 1982 field investigation confirmed widespread contamination in all of the sampled media (namely soil, groundwater, sewers, sediment, and ambient air). In May 1986, the DEC designated the site a Class 2 site—meaning that it was a "significant threat" to the public health or environment—and brought an enforcement proceeding to compel ELG to address contamination at the site. Joint App'x 947.

**B. ELG's Response to the Contamination**

The DEC enforcement action proceeded at a slow pace due to many "motions, cross motions, appeals and interim decisions," during which the recycling companies refused to perform a Remedial Investigation/Feasibility Study ("RI/FS"). Eventually, in December 1993, the companies agreed to perform a partial investigation on the condition that the DEC bifurcate the site to enable a phased approach to a full site-wide investigation. The DEC agreed to the phased approach and divided the site into two parts: the Utica Alloys site (phase 1) and the Universal Waste site (phase 2).

### 1. Phase 1: the 2007 Cleanup of the Utica Alloys Site

In 1999, the recycling companies entered a consent order with the DEC to perform a RI/FS and interim remedial measures ("IRMs"). In 2007, after eight years of investigation and planning, ELG implemented an IRM over the Utica Alloys site: ELG excavated and disposed of 715 tons (more than 21 truckloads) of contaminated soil. ELG also removed 6,951 gallons of contaminated groundwater.

### 2. Phase 2: the 2015 Cleanup of the Universal Waste Site

In 2012, the DEC notified ELG that it was a party responsible for contamination present at the Universal Waste site, the nearby Mohawk River, and an associated wetland. The DEC requested ELG develop and implement a two-step "Remedial Program" for the Universal Waste site. ELG was asked to (1) conduct a RI/FS to determine the nature and extent of contamination, and (2) create a menu of options for the final remediation, one (or several) of which the DEC would select. The DEC sent identical notice letters to Appellees Special Metals and National Grid, advising them of their shared liability for the "disposal of PCBs at the site in the late 1970s." Joint App'x 1552.

Following a limited investigation, in 2015, the DEC and ELG entered a consent order in which ELG agreed to perform a RI/FS and IRMs at the Universal

8

Waste site. Pursuant to the 2015 order, ELG removed a soil berm and 13,393 tons of hazardous soil and debris. Remediation continues at the Universal Waste site.

**II.    Procedural Background**

In 2016, ELG brought suit under Sections 107(a) and 113(f)(1) of CERCLA seeking contribution for the costs of remediation at the Universal Waste site. Following discovery, the Appellees jointly moved for summary judgment, spoliation sanctions, and damages arguing that ELG's claims were time-barred and that ELG spoliated evidence.

In March 2023, the District Court granted Appellees' motion. The District Court dismissed ELG's CERCLA Section 107(a) claim as time-barred and found that ELG could not proceed under Section 113(f)(1) because it had not been sued under Section 106 or Section 107(a). The District Court also granted spoliation sanctions. On appeal, ELG challenges the District Court's determinations as to spoliation sanctions and its Section 107(a) claim.

**STANDARD OF REVIEW**

"We review de novo a district court's decision to grant summary judgment, construing the evidence in the light most favorable to the party against whom summary judgment was granted and drawing all reasonable inferences in that party's favor." *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 135 (2d Cir. 2023). Under

9

Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting what is now Fed. R. Civ. P. 56(a)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## DISCUSSION

**I.** **ELG's CERCLA Claim Is Time-Barred.**

ELG seeks contribution from the Appellees under Section 107 of CERCLA, which allows a party to "seek reimbursement for all removal or remedial costs associated with . . . hazardous materials on [contaminated] property." *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120–21 (2d Cir. 2010) (footnote omitted); 42 U.S.C. § 9607(a).

An action for the recovery of costs related to remedial actions under CERCLA carries a six-year limitations period, which commences upon initiation of physical on-site construction of the remediation. 42 U.S.C. § 9613(g)(2)(B). Here, the District Court concluded that ELG initiated remedial action in 2007, followed up with further remedial steps in 2015, and sued in 2016. On this basis, the District Court concluded that ELG's Section 107 claim is time-barred because

10

the statute of limitations started to run in 2007 and elapsed before ELG brought suit. We agree.

### A. The District Court Correctly Identified the Relevant "Facility" Under CERCLA.

As a preliminary matter, ELG contends that the District Court erred when it determined that the relevant CERCLA "facility" in question covers the entire 23-acre property. Instead, ELG asserts that the 1.5-acre Utica Alloys and 21.5-acre Universal Waste sites are two separate facilities under CERCLA. ELG seeks contribution for response costs incurred *only* at the Universal Waste site (from phase 2 of the cleanup). It contends that because the 2007 cleanup addressed contamination at a different CERCLA facility (i.e., the Utica Alloys site, during phase 1), the 2007 response could not have triggered the statute of limitations for cost recovery on the Universal Waste site. ELG thus argues that its Section 107 claim is not time-barred. *See MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 230 (2d Cir. 2020), *as amended* (Aug. 13, 2020) (if the contamination "problems . . . were . . . elsewhere," the subsequent remediation "should not be considered part of the [first] remediation").

The District Court concluded that the full 23-acre site constitutes a single facility for CERCLA purposes for two principal reasons. First, the District Court

found that the "contamination at issue extends throughout the 23-acre Site and results from the same sources." *ELG Utica Alloys, Inc. v. Niagara Mohawk Power Corp.*, No. 16-CV-1523, 2023 WL 2655111, at *18 (N.D.N.Y. Mar. 27, 2023). Second, the District Court reasoned that the "Universal Waste and Utica Alloys Sites have shared common ownership, control, and management since at least 1984." *Id.* "This common ownership and management weigh[ed] in favor of finding a single facility." *Id.*

We see no error in the District Court's reasoning. The District Court correctly identified at least two factors relevant to the identification of a "facility." First, because CERCLA broadly defines "facility" to include "any site or area where a hazardous substance has been deposited," 42 U.S.C. § 9601(9), a site with a single source of pollution is ordinarily considered one facility for CERCLA purposes.[2] *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n.15 (2d Cir. 1985). Thus, an area that cannot be reasonably or naturally divided into multiple

---

[2] CERCLA defines "facility" as follows:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

parts or functional units should be defined as a single facility. *See, e.g., Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 417 (4th Cir. 1999); *United States v. 150 Acres of Land*, 204 F.3d 698, 709 (6th Cir. 2000); *Sierra Club v. Seaboard Farms Inc.*, 387 F.3d 1167, 1170–71, 1174–75 (10th Cir. 2004); *cf. Nurad, Inc. v. William E. Hooper & Sons Co.*, 966 F.2d 837, 843 (4th Cir. 1992) (holding that a site was divisible into separate facilities where it "was subdivided and separate portions of it were leased out to individual tenants").

Second, sites that are managed or operated by a single party, and that are used for the same purposes, ordinarily constitute a single facility under CERCLA. *See United States v. Township of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998) (determining that an entire property constituted a single facility where "the entire property was operated together as a dump"); *Axel Johnson, Inc.*, 191 F.3d at 419 (holding that the entire property was a single facility where it "was at all relevant times operated by a single party").

The District Court correctly applied these factors to conclude that the full 23-acre site was a single facility. First, the District Court found, and the parties do not contest, that the PCB and TCE contamination at issue extends throughout the 23-acre site and results from the same sources. Second, both sites have been owned

13

and managed by the same operators since at least 1984. It is undisputed that the full 23 acres have been controlled by the "same voting stockholder, officers, and directors" and that they "used the same buildings and areas at the Site." Joint App'x 1728 (Fact 3), 1730 (Fact 18). Indeed, Utica Alloys and Universal Waste were both run by the same President, Joseph Jiampietro. These managers and operators then used the full 23 acres for a single joint activity: recycling operations. Universal Waste and Utica Alloys coordinated recycling operations by using the same buildings, sharing costs, handling the same scrap material, and using the same address. Finally, since 1984, the full 23-acre property has been owned by a single company.[3] Given these factors, the District Court correctly concluded that the Universal Waste and Utica Alloys sites composed a single facility for CERCLA purposes.

ELG argues that the 23-acre property should be considered two separate facilities because in 1998, the DEC divided the full facility into two sites—the Universal Waste and Utica Alloys sites. But the DEC did not bifurcate the facility because it fell along "reasonabl[e] or natural[]" lines. *Axel Johnson*, 191 F.3d at 417.

---

[3] Initially, the 23-acre site was owned by Clearview Acres, Ltd., another Jiampietro company. Clearview leased the site to both Utica Alloys and Universal Waste for their recycling operations. Clearview, Utica Alloys, and Universal Waste were eventually acquired and merged to create ELG.

Instead, the DEC bifurcated the facility for administrative convenience. Accordingly, the District Court concluded that the DEC's 1998 bifurcation of the 23-acre site did not mean that there were two separate facilities under CERCLA.

We see no error. The DEC divided the 23-acre site in 1998 *upon ELG's request*, as part of a phased approach to the investigation and remediation of the property. The DEC agreed to the phased approach on the condition that ELG provide "some assurance that the second phase (investigation of the Universal Waste portion of the site) [would] actually take place in a timely manner." Joint App'x 1088. The DEC noted that its purpose in bifurcating the site was "to facilitate an independent remediation" of the two portions of the site. *Id.* at 1159. Significantly, the 1998 bifurcation of the facility occurred nearly *twenty years after* the discovery of contamination.[4] The District Court correctly concluded that the DEC's administrative bifurcation of the facility to speed up remediation did not raise a genuine issue of disputed fact as to whether the full 23-acre property was a single facility for CERCLA purposes.

---

[4] In fact, prior to the 1998 administrative bifurcation, ELG itself appeared to treat the full 23-acre site as a single facility. *See* Joint App'x 1729 (Facts 7–8) (between 1980 and 1998, all 23-acres of the site were listed on the Registry as a single site); *id.* (Facts 11–12) (ELG investigated the contamination on the full 23-acres of the site pursuant to a 1982 agreement with DEC).

15

**B. The Statute of Limitations Began to Run in 2007.**

Turning to the statute of limitations, CERCLA identifies two kinds of cleanup actions that each carry a different limitations period: "[1] remedial actions—generally long-term or permanent containment or disposal programs— and [2] removal efforts—typically short-term cleanup arrangements." *Schaefer v. Town of Victor*, 457 F.3d 188, 195 (2d Cir. 2006). The statute of limitations for "remedial" actions is "six years after the *initiation* of physical on-site construction of the remediation." *Id.* (emphasis added) (citing 42 U.S.C. § 9613(g)(2)(B)). The limitations period for "removal" actions is "three years after the *completion* of the removal." *Id.* (emphasis added) (citing 42 U.S.C. § 9613(g)(2)(A)).

The District Court concluded that both the 2007 and 2015 cleanups were remedial in nature and, consequently, the six-year limitations period began to run in 2007. In 2007, ELG's predecessors excavated 715 tons of contaminated soil and pumped 6,951 gallons of contaminated groundwater for transfer and offsite disposal. This work, according to the District Court, marked the "initiation of physical on-site construction of the remediation" at the facility. *Id.*

The District Court further concluded that the subsequent 2015 remediation—which is ongoing—addresses the same underlying contamination

16

as the 2007 remediation, and therefore is part and parcel of the 2007 work. Accordingly, the District Court reasoned that the statute of limitations for the 2015 cleanup also started to run in 2007 because the 2015 remediation was initiated in 2007. ELG concedes that the 2015 cleanup was remedial but contends that the 2007 cleanup was a *removal* action and, consequently, the 2015 remediation started a separate limitations period.

We agree with the District Court that the 2007 work was remedial and that the six-year statute of limitations began to run once the remedial work started. We also agree that the ongoing 2015 cleanup is a continuation of the 2007 remediation, and thus, did not restart the limitations period.

### 1. The 2007 Response Action Was Remedial in Nature.

CERCLA defines a removal action as:

> the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23). Meanwhile, CERCLA defines remediation as:

> those actions consistent with *permanent remedy* taken instead of or in addition to removal actions in the event of a release or threatened release of

17

a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

42 U.S.C. § 9601(24) (emphasis added).

Based on these definitions, the District Court concluded that the 2007 soil excavation and disposal and groundwater removal was remedial for three reasons: (1) it was "consistent with a permanent remedy," (2) it was "aimed at eliminating the source of the PCB contamination," and (3) there was "no evidence that the 2007 soil excavation and disposal were conducted to address an imminent threat or emergency situation." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *19–20.

We agree. We have been clear that removal actions are "clean-up measures taken in response to immediate threats to public health and safety that address contamination at its *endpoint*." *MPM Silicones*, 966 F.3d at 219 (emphasis added) (internal quotation marks omitted). By contrast, remedial actions are "typically actions designed to permanently remediate hazardous waste that address contamination at its *source*." *Id.* (emphasis added) (internal quotation marks omitted). Thus, removal actions "are often planned and executed relatively quickly in order to immediately abate public health hazards," while remedial actions take place "generally after months (if not years) of correspondence with

18

regulators." *Id.* at 220. The "key distinction" between removal and remedial actions, then, is "immediacy and comprehensiveness." *Id.* at 219.

Soil excavation and groundwater disposal can occur during both removal and remedial actions.[5] Accordingly, whether disposal of soil and groundwater is a removal or remedial action turns on whether the work addresses an immediate threat or seeks to permanently remedy the contamination at its source. *See N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.* ("*NYSEG*"), 766 F.3d 212, 234 (2d Cir. 2014) (cleanups that are "not designed to address an imminent health concern" are not removal actions).

The District Court concluded that the 2007 soil excavation and groundwater disposal was not a removal action because ELG "offered no evidence that the 2007 soil excavation and disposal were conducted to address an imminent threat or emergency situation." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *20. We agree. As the District Court pointed out, the 2007 soil removal addressed the same PCB contamination that was first discovered in 1979 and occurred after eight years of

---

[5] 42 U.S.C. § 9601(23) (defining "removal" to include "the disposal of removed material"); *id.* § 9601(24) (defining "remedial action" to include "offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials").

planning, investigation, and coordination with the DEC.[6] The 2007 response was conducted pursuant to a 1999 consent order, after a "Remedial Investigation and Interim Remedial Measures Alternative Analysis program" was initiated that year. The 2007 response thus occurred after "months (if not years) of correspondence with regulators," investigation, and planning. *MPM Silicones*, 966 F.3d at 220. And the response did not occur until almost thirty years after the discovery of contamination. ELG does not contest that the 2007 action sought to remedy longstanding contamination known since 1979, nor does ELG suggest the threat grew worse shortly before the 2007 response. Accordingly, the District Court was correct to conclude that the 2007 soil excavation was not an "immediate response" to an imminent threat, and therefore not a removal action. *NYSEG*, 766 F.3d at 233.[7]

Instead, the 2007 work was "consistent with [a] permanent remedy" for PCB and TCE contamination, because it sought to address the source of the underlying

[6] *See, e.g.*, Dkt. No. 253-3 (1979 memorandum enclosing laboratory results confirming presence of PCBs and TCE); Dkt. No. 253-7 (1982 DEC letter indicating that it was investigating the Site); Dkt. No. 253-8 (1982 Agreement); Dkt. No. 253-9 (1984 waste management study by independent consultant); Dkt. No. 254-3 (1986 request to reclassify the Site); Dkt. No. 254-9, at 2–3 (1991 NYSDEC memorandum noting delay and stating that the Site was not an "imminent threat").

[7] ELG's own actions make clear that it did not think the contamination warranted an emergency removal action response: it "repeatedly sought to delay or avoid investigating or remediating the Site, often arguing to NYSDEC that no action should be required." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *20 n.18.

contamination. 42 U.S.C. § 9601(24). CERCLA specifically lists such excavations and offsite disposals as "actions consistent with permanent remedy." *Id.* In *MPM Silicones*, we held that "steps to permanently prevent contaminants . . . from migrating away from their source—*i.e.*, the location of their burial" are remedial. 966 F.3d at 222–23. Here, the disposal of contaminated soil and groundwater equates to "permanent containment [and] disposal" of contamination. *Schaefer*, 457 F.3d at 195; *see also NYSEG*, 766 F.3d at 234–35 (excavation of contaminated soil as part of an IRM was a remedial action); *Schaefer*, 457 F.3d at 204 (plaintiff's "use of a crane to dig, drag and spread soil on-site clearly constitutes construction" of the remedial action). The District Court concluded the 2007 soil removal addressed a longstanding contamination problem dating back to 1979 and was not in response to an emergency. We see no error in that determination, and likewise conclude that the soil removal was remedial in nature.

ELG argues that this 2007 response cannot be characterized as remedial because it was "completed as part of an *interim* remedial measure required by [the] DEC, rather than any sort of final and permanent cleanup." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *19. But we have been clear that IRMs can constitute remedial actions. *See NYSEG*, 766 F.3d at 234–35 (noting that "IRMs can either be removal

21

or remedial actions" and holding CERCLA claim was time-barred where the cleanup at issue "was part of a larger remedial action"). The fact that a "final" remedial plan had not been determined at that time is not dispositive. *See Schaefer*, 457 F.3d at 207–09 ("[T]he plain language of the statute . . . speaks of 'actions *consistent with* permanent remedy' and nowhere mentions . . . approval of the final remedial action plan . . . .").

Consequently, we see no genuine dispute of material fact over whether the 2007 action was remedial in nature. The remaining question, then, is whether the statute of limitations for ELG's contribution claim began to run in 2007 or in 2015.

**2. The District Court Correctly Concluded the Statute of Limitations Began to Run with the Earlier 2007 Remediation.**

ELG seeks contribution for the costs of remediation arising solely from the 2015 consent order. ELG asserts that the limitations period should run based on the ongoing 2015 remediation, not the 2007 remediation. But the District Court reasoned that because the 2007 and 2015 remediations addressed the same underlying contamination known since 1979, the 2015 action was a subsequent phase of the 2007 work and the limitations period consequently commenced in 2007.

22

We agree. The single-remediation principle "means simply and logically that the plaintiff cannot escape the six-year limitation period and endlessly postpone the bringing of suit by characterizing subsequent phases of the initial project as new remediations." *MPM Silicones*, 966 F.3d at 225. Under this principle, if a later remedial action is a subsequent step in an earlier remediation, the limitations period commences upon physical on-site construction of the earlier remediation. *Id.* A later remediation is a subsequent step where a plaintiff has "a general awareness of the contamination problems" at the time it initiates remedial action and the subsequent remediation was "either (1) [a] further step[] towards remediating the original problems, or (2) [a] step[] to remediate different aspects of the originally known problem." *Id.* (internal citations omitted). Under these circumstances, we have held that applying the single-remediation principle is "fair and sensible," so long as there is "no impediment that would have prevented the plaintiff[] from suing the contaminator within six years of initiating the remediation." *Id.*

By contrast, where a later remediation "seeks to address a different set of problems—*e.g.*[,] problems that were non-existent, unknown, elsewhere, or undisclosed to the regulators and unrevealed in an earlier remediation plan—[the

later remediation] should not be considered part of the [first] remediation." *Id.* at 230.

The District Court applied the single-remediation principle and concluded that the limitations period for the 2015 remediation commenced in 2007. We see no error. It is undisputed that ELG (and its predecessors) had "a general awareness of the [soil] contamination problems" since 1979. *Id.* at 225. The 2015 consent order led to further remedial investigation into a wider array of contaminants in the soil than the 2007 soil excavation and led to the offsite disposal of a PCB-contaminated soil berm. But the District Court concluded that these responses ultimately addressed the same underlying contamination known to the companies since 1979. Actions resulting from the 2015 consent order were therefore "further steps towards remediating the original problems" or "steps to remediate different aspects of the originally known problem." *Id.*; *see also NYSEG*, 766 F.3d at 235–36 (applying single-remediation principle because both remediations at the site addressed the same contamination from the same source). ELG presented no evidence from which a reasonable factfinder could conclude the contamination addressed by the 2015 consent order was a

24

"different . . . problem[]" that was "non-existent, unknown," or not foreseen at the time of the 2007 soil excavation. *MPM Silicones*, 966 F.3d at 230.

ELG argues the single-remediation principle should not apply because remedial investigations are ongoing and a final remedy has not been selected for any portion of the facility. Specifically, ELG contends that applying the single-remediation principle while remedial investigations are ongoing would encourage plaintiffs to bring premature suits asserting speculative costs. But if we were to hold that the single-remediation principle does not apply until a final remedy has been selected, a remediator could endlessly "delay suit" by engaging in piecemeal excavations of contamination over a prolonged period of time—which is exactly what the single-remediation principle seeks to guard against. *Id.* at 229. That is why in *MPM Silicones*, we did not require that remedial investigations be completed for the statute of limitations to run. Instead, we reaffirmed that the single-remediation principle is appropriately applied where a plaintiff has "at least a general awareness of the contamination problems" and "undertake[s] at the outset to remedy them." *Id.* at 225.

Finally, the District Court correctly concluded that applying the principle was "not unfair" because "nothing precluded [ELG] from bringing a Section 107

cost recovery action . . . prior to the expiration of the limitations period." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *22. ELG does not contest this. As the District Court noted, ELG was "aware well before it initiated the 2007 soil excavation and disposal that certain [Appellees] might be responsible for a share of response costs incurred in relation to the Site and that litigation might be necessary to recover those costs." *Id.* As early as 1989, after it declined to join Special Metals and General Electric as defendants in the then-pending enforcement action, the DEC advised ELG of its right to seek relief from those Appellees but ELG elected not to do so. *See* Joint App'x 1731–32; *see also id.* at 1030–33; *id.* at 1048–51 (reporting that the company President "would like to [] delay the investigation and remediation of the site as long as possible" and "does not want, at this time, to sue General Electric, which is his best customer, or Special Metals, another important customer"). Applying the single-remediation principle is appropriate because nothing prevented ELG from suing within six years of initiating the remediation. *See MPM Silicones*, 966 F.3d at 225. Accordingly, we agree with the District Court that because the statute of limitations on ELG's Section 107 claim began to run in 2007, it is time-barred.

**II.    The District Court Did Not Abuse Its Discretion in Granting the Motion for Spoliation Sanctions.**

The District Court also imposed spoliation sanctions on ELG for shredding 23,020 pounds of documents. In 2021, ELG informed Appellees that historic records relating to the Universal Waste and Utica Alloys sites were kept in a storage room at ELG's Herkimer, New York location. Defense counsel reviewed hundreds of boxes in the storage room and located an invoice and other records indicating that ELG used the services of another company to shred 23,020 pounds of paper. After several Rule 30(b)(6) depositions of three ELG officials, the District Court concluded, and ELG does not contest, that, in March 2014, "hundreds of boxes" were intentionally destroyed, even though ELG had an "informal" policy to never destroy documents. *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at \*10–11, 13.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). A party seeking sanctions based on spoliation must establish by a preponderance of evidence: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records

27

were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018). The District Court concluded that ELG had a duty to preserve documents relevant to the facility before March 2014, that ELG acted with gross negligence when it destroyed the documents in question, and that the evidence was relevant to Appellees' claim.

We see no error. First, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). The District Court found that long before March 2014, ELG was on notice that it should retain evidence that might be relevant to the litigation. Around that time, ELG was embroiled in a longstanding administrative enforcement dispute with the DEC concerning soil contamination at the facility. ELG had already entered into multiple consent orders with the DEC, including as recently as November 2012. That 2012 consent order specified that ELG had the right "to seek and obtain contribution, indemnification, and/or any other form of recovery" under CERCLA. Dkt. No.

28

258-10, at 9. The DEC also identified ELG as a "responsible party for the [Universal Waste] site's contamination" in a 2012 notice letter. Dkt. No. 258-7, at 3. That letter specified that the State was sending identical notice letters to other responsible parties, including Appellees Special Metals and National Grid. *Id.* at 2–3. Finally, at the time of the documents' destruction, ELG was awaiting a state-court decision on its 2011 challenge to the DEC's decision upholding the Universal Waste site's Class 2 designation. We agree with the District Court that the ongoing and threatened litigation should have put ELG on notice of its duty to preserve relevant documents.

Second, we see no error in the District Court's conclusion that the 23,020 pounds of documents were "destroyed with a culpable state of mind." *Klipsch Grp., Inc.*, 880 F.3d at 628. A party may establish a culpable state of mind by "showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'" *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (alteration in original) (emphasis and citation omitted). The District Court concluded, and it is undisputed, that ELG "knowingly destroyed the documents at issue in March 2014." *ELG Utica Alloys, Inc.*, 2023 WL 2655111, at *13.

The District Court went further and concluded that the destruction of the documents was grossly negligent, because ELG failed to institute a litigation hold (and has failed to do so to date) and further "failed to implement reasonable measures to preserve and protect relevant documents." *Id.* We see no error. While a failure to institute a litigation hold does not alone constitute gross negligence, it is a factor relevant to the determination. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012). The District Court explained that in addition to that failure, ELG shredded a staggering 23,020 pounds of documents, despite having an informal policy to *never* destroy documents. No record exists as to what specific documents were destroyed, and ELG had no system for tracking which documents were kept or removed from its storage facility. Under these circumstances, the District Court appropriately concluded that ELG's conduct amounted to gross negligence.

Third, and finally, we agree with the District Court that the destroyed documents would likely have been relevant and favorable to Appellees. We have held that "a showing of gross negligence in the destruction . . . of evidence" can "stand[] alone" to "satisfy[] the 'relevance' factor." *Residential Funding Corp.*, 306 F.3d at 109 (internal citation omitted).

On appeal, ELG does not challenge the choice of an appropriate sanction. Instead, the parties jointly stipulated to a sanction of $300,000 should this Court uphold the District Court's conclusion that ELG spoliated evidence. Accordingly, we conclude that the District Court did not abuse its discretion in imposing spoliation sanctions on ELG.

## CONCLUSION

For the reasons set forth above, we **AFFIRM** the District Court's order granting summary judgment to Appellees, **AFFIRM** the imposition of spoliation sanctions, and **REMAND** to the District Court to order the agreed-upon sanction.